

SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>HONOLULU AFFORDABLE<br>HOUSING PARTNERS, LLC,<br><br>                        Debtor. | Case No.: 15-00146<br>Chapter<br><br>Re: Docket No. 39 |

## MEMORANDUM OF DECISION ON
## MOTION TO DISMISS INVOLUNTARY PETITION

A member of a largely defunct limited liability company has filed an involuntary bankruptcy petition against the LLC. The LLC, through its managing member, seeks dismissal of the petition. For the following reasons, I will grant the motion.

## I.  FACTS

During February 2012, the City and County of Honolulu formally solicited proposals to lease from the City twelve affordable rental and mixed use properties. The alleged debtor, Honolulu Affordable Housing Partners, LLC ("HAHP"), was formed to make and carry out such a proposal.

Highland Property Development LLC ("HPD"), a California limited liability

company, is the managing member of HAHP. HPD owns a 55% interest. The non-managing members of HAHP are FGD, LLC, a Hawaii limited liability company, and 7 Eccles Street Investments, LLC ("7 E Street"), which own 40% and 5% respectively.[1]

HAHP was required to make deposits of $1 million and $4 million with the City. HAHP's operating agreement required FGD to "loan those amounts to [HAHP] at an interest rate equal to six percent (6%) per year."[2] The loan was to mature on the earliest to occur of (1) the closing of the transaction with the City, (2) the termination of that transaction, or (3) March 31, 2014. If and when the transaction with the City closed, FGD agreed that the loans would (in effect) be converted to capital of HAHP.[3]

The promissory notes which HAHP executed to evidence the loans provide that "[p]ayments made under this Note prior to the Maturity Date will be applied when received first to the payment of accrued interest and then to the reduction of outstanding principal." The notes say nothing else about the application of payments.[4]

The City selected HAHP as the successful bidder. But almost nothing else went right. Internal disputes plagued HAHP from its inception. At about the same time as HAHP was formed, disputes flared among the members of HPD. These disputes

---

[1] Dkt. 11-13 at 2, 23.

[2] Dkt. 11-13 at 23.

[3] *Id.*

[4] Dkt. 3-1 at 1.

became particularly salient on October 31, 2013, the deadline to make a deposit of about $671,000 in order to preserve certain tax credits. On the day the deposit was due, one member of HPD, William E. Rice ("Rice"), told another HPD member, Gary P. Downs ("Downs"), that Rice would not cause HAHP to fund the required City deposit unless Downs signed a settlement agreement that day.[5] Downs refused to sign the settlement agreement and instead funded the deposit himself.[6]

Eventually, HPD's internal disputes were resolved, partly by arbitration. As a result, at the end of January 2014, Downs and Kristoffer Kaufmann ("Kaufmann") replaced Rice as manager of HPD.[7]

This did not, however, resolve the entire dispute about the deposit. Rice (on behalf of HPD) and FGD still contend that Downs lacked authority to make the deposit on behalf of HAHP and that therefore that expenditure was not a legitimate capital contribution to HAHP.[8]

On January 23, 2014, the City terminated the transaction. Accordingly, FGD's loan to HAHP matured and became due and payable on that day. On January 29, 2014, HAHP made a partial payment of $5 million. According to FGD, $297,265.13 was unpaid as of February 19, 2014.[9] FGD calculated this figure by applying the $5

---

[5] Dkt. 39 at 26; dkt. 39 at 32.

[6] Dkt. 39 at 27.

[7] Dkt. 33 at 2; dkt. 39-1 at 8.

[8] Dkt. 33 at 3-4.

[9] Dkt. 3 at 4-5.

3

U.S. Bankruptcy Court - Hawaii   #15-00146   Dkt # 53   Filed 05/07/15   Page 3 of 15

million payment first to accrued interest, and late charges, and then to principal.[10] HAHP argues that the payment should be applied first to principal, and then to interest and charges.[11] This application would completely retire the principal balance of the loan, which means that interest is no longer accruing.

On February 20, 2014, HAHP demanded that FGD make a capital contribution of $671,407. HAHP did not demand that HPD contribute the same amount, contending that Down's payment of the $671,407 deposit for the tax credit preservation amounted to a capital contribution by HPD. FGD refused to make the demanded capital contribution on multiple grounds. FGD said, however, that it would pay its 50% share of the unpaid debts of HAHP, and urged HAHP to pay its undisputed debts promptly.[12]

FGD also demanded that HPD, as managing member of HAHP, take steps to wind up HAHP. HPD declined, saying that HAHP should be preserved in case the City offered the properties again. FGD also alleges that HPD has failed to comply with FGD's demands for access to HAHP's records.[13]

HAHP apparently paid most of its debts except for FGD's loans and unpaid fees owed to its counsel, Gelber Gelber & Ingersoll.[14] HAHP disputes both of these

---

[10]*Id.*

[11]Dkt. 39-1 at 23.

[12]Dkt. 32 at 4-5.

[13]Dkt. 3 at 7.

[14]*Id.*

U.S. Bankruptcy Court - Hawaii    #15-00146    Dkt # 53    Filed 05/07/15    Page 4 of 15

debts. HPD claims that HAHP also owes money to the Nixon Peabody law firm; FGC disputes that this is an obligation of HAHP.

HAHP's assets apparently consist only of the plans, studies, and surveys it compiled to formulate its bid to the City (the "Intellectual Property") and possible claims against FGD for the capital call and others for avoidable transfers. The value of these assets is unknown.

## II. STANDARD

Only a person who is "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" may file an involuntary bankruptcy petition.[15]

If the alleged debtor "timely controverts" the petition, "after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if . . . the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[16]

A claim is subject to a "bona fide dispute" if "there is an objective basis for either a factual or a legal dispute as to the validity of the debt."[17] In other words, "if there is either a genuine issue of material fact that bears upon the debtor's liability, or

---

[15] 11 U.S.C. § 303(b).

[16] *Id.* § 303(h)(1).

[17] *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1064 (9th Cir. 2002) (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir.1987)).

a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed."[18]

In 2005, Congress amended section 303 by adding the phrase "as to liability or amount" after the phrase "bona fide dispute." Therefore, the dispute can relate to liability on the claim or the amount of the claim, and not just the validity of the debt.[19] This overrules prior decisions holding that the dispute about the amount of a claim disqualifies the petitioning creditor only if the undisputed portion of the claim is less than the statutory minimum amount.[20]

To determine whether the alleged debtor is "generally not paying its debts as they become due," the court must examine the totality of the circumstances, taking a general view "of the debtor's financial condition and debt structure." It is not sufficient to "merely establish[] the existence of a few unpaid debts."[21]

The court may dismiss a voluntary or involuntary bankruptcy case "at any time if . . . the interests of creditors and the debtor would be better served by such dismissal . . . ."[22] In deciding whether to exercise this power, the court must examine

---

[18]*In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich.1986), (quoted with approval in *Vortex Fishing Sys. Inc.*, 277 F.3d at 1064).

[19]*Regional Anesthesia Assocs. PC v. PHN Physician Servs., Inc. (In re Regional Anesthesia Assocs, PC)*, 360 B.R. 466, 469 (Bankr. W.D. Pa. 2007); *In re Excavation, Etc., LLC*, 2009 WL 1871682 at *2 (Bankr. D. Or. June 24, 2009).

[20]*Focus Media, Inc. v. National Broadcasting Co. (In re Focus Media, Inc.)*, 378 F.3d 916, 925-26 (9th Cir. 2004); *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005 (9th Cir. 1998).

[21]*Focus Media*, 378 F.3d at 928-29, (citing *In re Vortex*, 277 F.3d at 1072 (quoting *Semel v. Dill (In re Dill)*, 731 F.2d 629, 632(9th Cir. 1984))).

[22]11 U.S.C. § 305(a)(1).

U.S. Bankruptcy Court - Hawaii   #15-00146   Dkt # 53   Filed 05/07/15   Page 6 of 15

the totality of the circumstances, and "must make specific and substantiated findings that the interests of the creditors and the debtor will be better served by dismissal . . . ."[23]

## III. DISCUSSION

### A. The Operating Agreement Does Not Bar FGD From Filing An Involuntary Petition Against HAHP.

HAHP contends that, under its operating agreement, FGD lacks standing to assert claims or file an involuntary petition against HAHP. I disagree.

HAHP relies primarily on section 6.2 of its operating agreement. That section gives HPD, as HAHP's manager, exclusive power to "control and manage the Business and affairs of" HAHP, including the power to "[i]nstitute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against" HAHP.[24] According to HAHP, this provision means that only HPD can sue HAHP. This is a manifestly unreasonable interpretation of the operating agreement. The only reasonable interpretation is that HPD, as manager of HAHP, has the exclusive power to file suit on behalf of HAHP or defend suits brought against HAHP. It is absurd to say that no one other than HPD could ever sue HAHP. The operating agreement does not restrict any party's rights to assert otherwise valid claims against the company, or give the company's manager a simple veto power over such suits.

---

[23]*In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 246-48 (B.A.P. 9th Cir. 2007).

[24]Dkt. 11-13 at 38-39.

7

U.S. Bankruptcy Court - Hawaii   #15-00146   Dkt # 53   Filed 05/07/15   Page 7 of 15

HPD also relies on section 9.2 of the operating agreement, which gives the members of HAHP certain remedies if an "Adverse Act" occurs.[25] These provisions do not apply. The operating agreement carefully defines an "Adverse Act" as certain kinds of acts or omissions by a Member of HAHP.[26] A default by HAHP itself (such as its failure to pay its debt to FGD) is not an "Adverse Act." Therefore, section 9.2 is irrelevant.

### B. FGD's Claim Is Subject To A Bona Fide Dispute.

HAHP argues that FGD is not a qualified petitioning creditor because FGD's claim is subject to a bona fide dispute. HAHP's arguments fit in four categories.

#### 1. HAHP's Illegitimate "Recharacterization" Of FGD's Claim Does Not Create A Bona Fide Dispute.

HAHP contends that it "recharacterized" its debt to FGD as equity and that, as a result, FGD no longer holds a claim against HAHP.

I reject this contention. A debtor, such as HAHP, does not have the unilateral right, in the absence of a creditor's consent, to refuse to pay the creditor's otherwise valid claim and instead treat that claim as a capital contribution to the debtor.

HAHP's argument rests upon provisions of the operating agreement that generally give HPD the power, as HAHP's manager, to take actions that benefit HAHP. If HAHP's argument were correct, no LLC, and for that matter no corporation, would ever have to pay its debts, because wiping out debts without

---

[25]Dkt. 11-13 at 53-54.

[26]Dkt. 11-13 at 4-5.

8

paying them is always beneficial to the company.

HAHP's use of the general powers provisions of the operating agreement to convert FGD's debt to equity is also inconsistent with a specific provision governing FGD's loan. Section 4.1(b) of the operating agreement provides that, upon closing of the transaction with the City, FGD would make a capital contribution to HAHP in an amount equal to HAHP's then outstanding debt to FGD, and that HAHP would use that contribution to repay FGD's loans.[27] These transactions would effectively convert FGD's debt to equity. But the operating agreement makes clear that this conversion would take place only upon closing of the transaction with the City. Construing the general provisions of the operating agreement to permit HAHP to "recharacterize" its obligation to FGD at any time would render section 4.1(b) superfluous.

### 2. There Is No Bona Fide Dispute About The Application Of HAHP's Partial Payment.

FGD argues that interest continues to accrue on its claim. HAHP contends that, because HAHP's $5 million partial payment should be applied to principal, interest is not accruing. Therefore, according to HAHP, FGD's claim is subject to a bona fide dispute.

I agree with FGD. The provision on which HAHP relies does not support its argument.

Each of the promissory notes provides that:

From time to time, [HAHP] may make voluntary prepayments of

---

[27]Dkt. 11-13 at 23.

9

principal in whole or in part with no prepayment premium or penalty. Payments made under this Note prior to the Maturity Date will be applied when received first to the payment of accrued interest and then to the reduction of outstanding principal.[28]

HAHP argues that because the note specifically provides that all payments made prior to the Maturity Date are applied to interest first, one must infer that payments made after the Maturity Date should be applied to principal first. This is an unreasonable interpretation of the notes. If HAHP were right, HAHP would be better off making payments after the Maturity Date – in other words, while HAHP was in default – than when it was not in default. The provision in the notes overcomes the general rule that a debtor making a voluntary payment can designate the application of that payment.[29] There is no reason to think that the parties intended that the opposite would apply to payments made after the Maturity Date. Partial payments are applied to interest first and then to principal unless the parties intend otherwise.[30]

### 3. The Capital Call Creates a Bona Fide Dispute.

HAHP argues that FGD's refusal to comply with the capital call creates a bona

---

[28] Dkt. 3-1 at 1; Dkt. 3-2 at 1.

[29] "It is elementary that in the absence of agreement and in the absence of direction from the borrower, the creditor may apply payments to any obligation it holds. Equally clear, if there be no provision to the contrary, the debtor may designate the application of payment and the creditor must comply with such direction. In the case there is a specific agreement covering application of payments on debts, it governs." *Union Trust Co. v. Nichols*, 35 Haw. 482, 495 (1940) (quoting *Reconstruction Finance Corporation v. McCormick*, 102 F.2d 305, 315 (1939)).

[30] *City and County of Honolulu v. Kam*, 48 Haw. 349, 366 (1965). There is no evidence of a contrary intent. Rice, who was the manager of HPD (and was therefore in control of HAHP) when HAHP made the $5 million payment, says that HAHP did not take a position at the time of the payment about the application of that payment. Dkt. 33 at 2. Kaufmann, who was not in control of HPD or HAHP at the time of the payment, said he "assumed," based on what he incorrectly views as the "ambiguous language" of the notes, that the payment should be applied first to principal. Dkt. 39-1 at 23.

10

fide dispute. FGD responds that the capital call was invalid and that, in any event, unrelated counterclaims do not raise a bona fide dispute about the creditor's claims.

FGD's legal point is correct; a debtor can not create a bona fide dispute about a creditor's claim by asserting an unrelated counterclaim against the creditor.[31] But if the facts that give rise to a counterclaim also create an affirmative defense (*i.e.*, impossibility of performance, offset/setoff, recoupment, etc.), the claim is subject to a bona fide dispute.[32]

HAHP argues that it needed additional funding to pay its debts and that FGD's nonpayment on the capital call prevented HAHP from paying the amounts due on the notes.[33] HAHP has a meritorious contention that FGD's alleged breach of the operating agreement excuses HAHP's default in repayment of its debt. There are also valid disputes of both fact and law concerning whether the advance to make the tax reservation deposit should be treated as a capital contribution by HPD.

To be clear, I express no opinion about the ultimate outcome of this dispute. I hold only that there is a bona fide dispute that disqualifies FGD as a petitioning creditor.[34]

---

[31] *Seko Inv., Inc.*, 156 F.3d at 1008.

[32] *Vortex Fishing*, 277 F.3d at 1067.

[33] "Congress intended to disqualify a creditor whenever there is an legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." *In re TPG Troy, LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y. 2013) (quoting *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117-18 (2nd Cir. 2003).

[34] "In the context of determining whether there is a bona fide dispute for purposes of § 303, '[a] bankruptcy court is not asked to evaluate the potential outcome of the dispute, but merely to determine whether there are facts that give rise to such legitimate disagreement over whether

11

U.S. Bankruptcy Court - Hawaii   #15-00146   Dkt # 53   Filed  05/07/15   Page 11 of 15

## 4. There Is A Bona Fide Dispute About The Calculation Of Interest.

Although it is difficult to sort out the details from the long exchange of emails in the record, it appears that, apart from the dispute about the application of the payment, the calculation amount of interest due to FGD is in dispute.

On January 31, 2014, HPD sent an email to FGD stating that the debt was $275,506.85. (The email refers to an attached schedule showing the calculation, but the exhibit omits the schedule.) FGD responded the same day, stating that the calculation was wrong because it did not apply the default rate of interest.[35]

On February 19, 2014, FGD formally demanded payment of the notes. The demand letter states that $281,260.27 was due as of January 29, 2014 and $297,265.13 was due as of February 19, 2014.[36]

The next day, HAHP demanded that FGD make a capital contribution. A schedule attached to the demand describes HAHP's alleged cash needs. The schedule says that $298,521 would be due to FGD on February 26, 2014, the date on which the capital call was due. This figure cannot readily be reconciled with FGD's demand of

---

money is owed, or, in certain cases, how much." *Marciano v. Fahs, et al.* (*In re Marciano*), 459 B.R. 27, 35-36 (B.A.P. 9th Cir. 2011) (quoting *Vortex Fishing*, 277 F.3d at 1064).

[35] Dkt. 32-5.

[36] Dkt. 32-7.

the preceding day.[37]

On February 25, 2014, FGD told HAHP that the capital call "misstates the loan agreement between HAHP and FGD with respect to the remaining balance of the principal and interest outstanding . . . ."[38] FGD did not explain what it thought was misstated.

HAHP responded on February 27, 2014, stating that FGD's "calculation of accrued interest up to the point of maturity appears to erroneously include an additional day of interest."[39] FGD's response says only that "[t]here is a continuing dispute about the principal and interest amounts currently owed to FGD."[40]

The amount in controversy may be only a hundred dollars or so. This is very small, both in absolute terms and in comparison with FGD's total claim. But section 303 makes clear that any bona fide dispute about the amount of the claim, regardless of its size, disqualifies the creditor from filing a petition.

FGD argues that this interpretation of section 303 would eviscerate involuntary bankruptcy. This may be true but it is irrelevant. Congress can grant, withhold, limit, or condition the involuntary bankruptcy remedy as it wishes. This limitation may have

---

[37] According to the figures given in FGD's demand letter, interest was accruing at a daily rate of $92.47 (which is twelve percent of the principal balance, $281,260.27) divided by 365. Based on this figure, FGD's claim would have increased to $297,912.41 by the date the capital call was due.

[38] Dkt. 32-10.

[39] Dkt. 32-11.

[40] Dkt. 32-20.

13

U.S. Bankruptcy Court - Hawaii   #15-00146   Dkt # 53   Filed  05/07/15   Page 13 of 15

undesirable consequences, but the court's job is to apply the statute as written.

### C. There Are Genuine Disputes Of Material Fact About Whether HAHP Is Generally Paying Its Debts As They Become Due.

HAHP contends that it is paying, or has paid, all of its debts except those which it legitimately disputes. FGD argues that the disputes are not bona fide. I need not decide this issue because the only petitioning creditor is not qualified. If it were necessary, I would hold that this question presents issues of fact requiring a trial.

### D. Dismissal Under Section 305.

HAHP argues that FGD filed this case in bad faith. FGD vigorously disagrees.

This case has many of the hallmarks of an improper involuntary bankruptcy. Apparently there are only two unpaid creditors, one of whom is also a member of the LLC and the other of whom has certain ties to a member. Thus, this is very close to a two-party dispute. The alleged debtor has few assets of uncertain value. State law and state courts provide remedies to resolve the disputes among the members.

FGD arguably has legitimate reasons for filing an involuntary petition. HAHP's responses to FGD's demands and proposals have been evasive and dilatory. HAHP's excuse for not winding up – the notion that HAHP might want to bid for the City properties again, even though it could not implement is prior winning bid and its members are at loggerheads – is threadbare. HPD's long history of bitter internecine litigation indicates that state court proceedings would be protracted and costly.

I cannot hold on this record that this is a bad faith case. Dismissal under section 305 requires a consideration of the totality of the circumstances. The record is not comprehensive enough to justify a determination one way or the other.

## IV. CONCLUSION

The claim of the only petitioning creditor is subject to a bona fide dispute. Therefore, this case is DISMISSED. Counsel for HAHP shall submit a proposed separate judgment. The court reserves jurisdiction to consider requests for fees, costs and damages.

**END OF ORDER**